**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | BAP Nos.   CC-17-1266-STaF |
| | CC-17-1269-STaF |
| JOEL WERNER and CATHLEEN WERNER, | |
| | Bk. No.   8:08-bk-11153-CB |
| Debtors. | Adv. No.   8:10-ap-01104-CB |
| JASON SCOTT WICKAM, | |
| Appellant, | |
| v. | **MEMORANDUM**[*] |
| ALAN IVAR; DEBORAH IVAR; DAVID ROCHE, | |
| Appellees. | |

Argued and Submitted on February 22, 2018
at Pasadena, California

Filed – February 13, 2019

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Catherine E. Bauer, Bankruptcy Judge, Presiding

Appearances:   Robert R. Anderson argued for appellant Jason Scott Wickam; Michael J. Carras of Conforti & Carras argued for appellees Alan Ivar, Deborah Ivar, and David Roche.

Before: SPRAKER, TAYLOR, and FARIS, Bankruptcy Judges.

---

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8024-1.

Memorandum by Judge Faris

Concurrence in Part and Dissent in Part by Judge Spraker

**INTRODUCTION**

Chapter 11[1] debtor Jason Scott Wickam appeals from a nondischargeability judgment under § 523(a)(2)(A) in favor of plaintiffs Alan Ivar, Deborah Ivar, and David Roche. This is the second nondischargeability judgment that the bankruptcy court has entered in the underlying adversary proceeding. In a prior appeal from the first nondischargeability judgment, we vacated and remanded for further findings.

On remand, the bankruptcy court made additional findings that adequately supported the nondischargeability judgment against Mr. Wickam. We discern no clear error.

Mr. Wickam also appeals from the denial of his postjudgment motion under Civil Rule 59(e). The bankruptcy court did not abuse its discretion in denying this motion. Therefore, we AFFIRM.

**FACTS**

**A. Prebankruptcy events**

    **1. The formation of Mr. Wickam's real estate development business and commencement of the Coral Blue project**

In November 2005, Mr. Wickam and Joel Werner formed Connexian Investments, Inc. ("Connexian") to develop real estate.

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. All "Civil Rule" references are to the Federal Rules of Civil Procedure.

Each held a fifty percent interest in Connexian, and they planned to use Connexian to purchase vacant land and build luxury homes on that land. At the time they created Connexian, neither had any direct experience in real estate development. Mr. Wickam had worked as a general building contractor and Mr. Werner owned a business marketing products. Neither had previously worked with the other, as they had met for the first time shortly before they went into business together.

Connexian's first development project involved the construction of four multi-million dollar homes on four lots on Coral Blue Street in Ladera Ranch, California (the "Coral Blue Project"). Connexian, through Mr. Wickam and Mr. Werner, contracted to purchase these four vacant lots for just under $1 million per lot. Mr. Wickam estimated a total development cost for the Coral Blue Project of $13 million.

Originally, the purchase contract required Connexian to close by May 1, 2006. Connexian, through Mr. Werner and Mr. Wickam, deposited $80,000 into escrow pursuant to the purchase contract. Connexian, however, was unable to procure financing from conventional lenders to purchase the lots. Connexian negotiated several extensions for the purchase based on additional deposits of funds into escrow. Connexian deposited a total of $220,000.

While negotiating the extensions of time to purchase the lots, Connexian retained RSD Group, Inc. ("RSD") to assist it in raising the money needed for the project. RSD agreed to invest $400,000 in the Coral Blue Project and referred Connexian to Point Center Financial for additional financing. Point Center

3

Financial was a "hard money lender."

## 2. Connexian's financing and the plaintiffs' initial investments

In June 2006, Point Center Financial and Connexian entered into a loan placement and fee agreement to fund the purchase of all four Coral Blue Project lots and to pay the development and construction costs for two of the homes (Lots 23 and 28). Point Center Financial agreed to lend Connexian $6,587,100 but only if Connexian raised an additional $1,615,085. Connexian informed Point Center Financial that it had the money necessary to close on the financing. On August 3, 2006, however, Point Center Financial told Mr. Wickam and Mr. Werner that it was unable to fund $2,148,800 of the $6,587,100 loan amount. Point Center Financial advised Mr. Wickam and Mr. Werner that it would use its best efforts to obtain the additional funding.

This was not the only funding shortfall Mr. Wickam and Mr. Werner faced. Several months earlier, RSD informed Mr. Wickam and Mr. Werner that it was not able to fund the $400,000 it had promised. Consequently, with RSD's assistance, Mr. Wickam and Mr. Werner began searching for other investors.

Around the same time, Mr. Wickam and Mr. Werner formed Coral Blue, LLC, a California limited liability company, for the stated purpose of purchasing, developing, selling, and managing the four lots at the Coral Blue Project.

### a. The Ivars' first investment ($216,000)

RSD introduced Alan and Deborah Ivar to the Coral Blue Project investment opportunity sometime in early August 2006. During a period of roughly two or three weeks, the Ivars had

4

multiple meetings and discussions with Mr. Wickam and Mr. Werner regarding the project. The Ivars also toured the Coral Blue Project lots with Mr. Wickam. The Ivars maintained that the issue of project loan financing came up several times during these meetings. They testified that they were told (presumably during these meetings) that the project loan financing was "in place" and that Mr. Wickam and Mr. Werner were using a "conventional lender." The Ivars said they understood this to mean a traditional bank was financing the project and not a hard money lender. The Ivars described their understanding of hard money lending as loans to borrowers who are not creditworthy. They further testified that they did not want to invest in projects funded with hard money loans.

The Ivars also reviewed documents provided to them by Mr. Werner and Mr. Wickam, including a subscription agreement and operating agreement for Coral Blue, LLC dated as of August 18, 2006. The operating agreement was signed by Mr. Wickam and Mr. Werner and had signature lines for the Ivars. The operating agreement reflects that the Ivars made a $216,000 capital contribution to Coral Blue, LLC and held 216,000 governance units and economic units for the limited liability company. Schedule 1 also listed Mr. Werner and his wife as having made a capital contribution, as well as five other investors, including RSD. (Mr. Roche, the other plaintiff and appellee, was not listed as an investor; as we explain below, he invested in Coral Blue, LLC roughly one month later, in September 2006.)

The Ivars made their first investment in Coral Blue, LLC on or about August 28, 2016. The Ivars gave Mr. Wickam and

5

Mr. Werner a check in the amount of $216,000 made payable to Coral Blue, LLC.[2]  In exchange for their investment, the Ivars received not only membership units in Coral Blue, LLC but also an "Unsecured Promissory Note" made in their favor by Connexian for $216,000. Mr. Wickam and Mr. Werner signed the promissory note on behalf of Connexian.  The note provided for repayment within a year and for interest to accrue at an annual rate of twenty-five percent.  Notwithstanding the note, the Ivars saw themselves as equity investors in Coral Blue, LLC, which they understood would purchase and develop the Coral Blue Project lots.  The Ivars testified that they did not consider the promissory note from Connexian to be significant.

### b.    Mr. Roche's investment ($200,000)

Unlike the Ivars, Mr. Roche previously knew Mr. Wickam from working with him on other projects in the construction industry. During the summer of 2006, Mr. Wickam approached Mr. Roche about investing in the Coral Blue Project.  Over the course of a month or so, Mr. Wickam contacted Mr. Roche on numerous occasions to discuss the project.  By early September 2006, Mr. Wickam began to pressure Mr. Roche to invest in the Coral Blue Project.  On September 9, 2006, Mr. Roche made a check payable to Connexian

---

[2] The Ivars' $216,000 check was not included in the parties' excerpts of record.  However, a copy of this check, and many other trial exhibits, are attached to the plaintiffs' post-remand motion for a post-appeal judgment.  We have exercised our discretion to take judicial notice of these and other bankruptcy court documents not included in the parties' excerpts. See Rivera v. Curry (In re Rivera), 517 B.R. 140, 143 n.2 (9th Cir. BAP 2014), aff'd in part, dismissed in part, 675 F. App'x 781 (9th Cir. 2017).

6

for $125,000, and on September 12, 2006, he made another check payable to Connexian in the amount of $75,000, for an aggregrate total investment of $200,000.

Mr. Roche's testimony regarding his pre-investment understanding of the project's loan financing was very similar to the Ivars': "conventional financing" through a "traditional bank." According to Mr. Roche, Mr. Werner made the specific representation to him that the project had conventional financing, and Mr. Wickam contemporaneously validated Mr. Werner's representation by immediately telling him that everything was taken care of.

Like the Ivars, Mr. Roche also believed that Coral Blue, LLC was going to purchase the four lots and hold title to them. Specifically, during his pre-investment meetings with Mr. Wickam and Mr. Werner, Mr. Roche testified that he was told that Coral Blue, LLC "was the vehicle to purchase four lots, build and sell four homes for profit on Coral Blue [S]treet." He also testified that someone expressly told him that the four lots would be purchased in the name of Coral Blue, LLC.

Like the Ivars, Mr. Roche received and signed a subscription agreement for Coral Blue, LLC. The subscription agreement signed by Mr. Roche is dated September 13, 2006. The record does not include an operating agreement signed by Mr. Roche; only an operating agreement dated June 6, 2006, signed by Mr. Wickam and Mr. Werner with a space for Mr. Roche's signature. That operating agreement does not disclose any other members in Coral Blue, LLC other than Mr. Werner, Mr. Wickam, and Mr. Roche, despite the fact that the Ivars had become members about a month

7

earlier.

### 3. The purchase of the Coral Blue Project lots

On September 15, 2006, both the Point Center Financial loan and Connexian's purchase of the lots closed. The parties stipulated that monies were transferred from Coral Blue, LLC's accounts to Connexian to fund the closing. Specifically, Coral Blue, LLC had less than $14,000 in its bank accounts on August 30, 2006, just prior to the depositing of the Ivars' first investment check. The parties agreed that the Ivars' $216,000 check was deposited into Coral Blue, LLC's bank account on either August 30 or 31, 2006. The parties further agreed that, prior to the closing of Connexian's purchase of the lots, "all but $41.33 of the money in the Coral Blue, LLC checking account and $215.53 of the Coral Blue, LLC savings account had been transferred into the Connexian checking account. The balance in those two accounts remained at about that level until the accounts were closed in 2008."

As a result of the sale, Connexian became the owner of record of the four Coral Blue Project lots, subject to a recorded deed of trust in favor of Point Center Financial. Both the note and deed of trust prohibited Connexian from selling or further encumbering the lots without Point Center Financial's prior written consent.

### 4. The Ivars' second investment ($600,000)

By November 2016, construction had begun on the first two lots. Around this time, Mr. Wickam and Mr. Werner approached the Ivars to make an additional investment in the Coral Blue Project. Mr. Wickam and Mr. Werner explained that they wanted to get an

8

early start on construction for the second pair of lots and needed additional funding for "bricks and sticks," which Mr. Ivar understood to mean actual construction costs.

As a result, the Ivars invested another $600,000 in two installments. The Ivars paid the first installment by check dated December 29, 2006 to Connexian in the amount of $200,000. Connexian deposited the funds into its bank account that same day. Also on December 29, 2006, the parties signed escrow instructions for the $200,000 loan. According to the escrow instructions, the Ivars were to receive a $200,000 note from Connexian payable in thirty days, bearing seven percent interest, secured by a second priority deed of trust against Lots 26 and 27 of the Coral Blue Project. Consistent with these instructions, Mr. Werner, on behalf of Connexian, executed a promissory note and a deed of trust against Lots 26 and 27, also dated that same day. The Ivars claimed that neither of them noticed the thirty-day term of the note. The Ivars also testified that Mr. Wickam and Mr. Werner instructed them not to record the trust deed because it (and the note) were "simply another layer of protection for [the Ivars'] investment in Coral Blue II LLC."

The Ivars paid the remaining $400,000 to Connexian by check dated April 18, 2007. While the two installments were paid several months apart, the Ivars apparently viewed both of them as part of their second investment because in exchange for these funds they received 600,000 membership units in a new company: Coral Blue **II**, LLC. According to the Ivars, Mr. Wickam and Mr. Werner represented that their $600,000 investment would be repaid with a twenty-five percent share of the net proceeds from

9

the future sale of Lots 26 and 27. There was no promissory note or deed of trust for the $400,000 investment.

Mr. Wickam and Mr. Werner, on behalf of Coral Blue **II**, LLC, and Mr. Ivar signed a Limited Liability Company Operating Agreement of Coral Blue II, LLC. That document is dated March 27, 2007, roughly two months after the $200,000 promissory note came due, and several weeks before the Ivars paid the $400,000 installment. Paragraph 2.6 of the Coral Blue II, LLC operating agreement described the company's business purpose similar to Coral Blue, LLC's, including "purchasing, developing, selling and managing residential properties." Whereas paragraph 2.6 of the Coral Blue, LLC operating agreement specifically identified the four Coral Blue Project lots as the object of the company's business purpose, the Coral Blue II, LLC operating agreement did not refer to any specific property.

Consistent with the Ivars' understanding of their $600,000 investment, the operating agreement for Coral Blue II, LLC shows the Ivars as owning 600,000 governance and economic units for the entity. Connexian is listed as owning the remaining 1,800,000 units in Coral Blue II, LLC. Mr. Wickam and Mr. Werner also gave the Ivars a document that the Ivars refer to as an "Investment Breakdown," executed on April 18, 2007, the same day the Ivars paid their $400,000 to Connexian. The Investment Breakdown projected that the Ivars would receive $702,062.50 from the sale of the houses to be built on Lots 26 and 27, attributable to a twenty-five percent interest.

**5.    Refinancing negotiations, default and foreclosure**

Connexian obtained a second loan from Point Center Financial

10

for $6 million in August 2007 to fund construction on Lots 26 and 27. Although the record is not entirely clear, it appears that, by this point, a substantial amount of construction work had been completed on Lots 23 and 28, and work had begun on Lots 26 and 27. While the parties were still working on closing this second loan, they began working on refinancing the first Point Center Financial loan. The first loan matured on October 1, 2007 without an agreement for refinancing. Even so, the parties continued to negotiate refinancing through most of October 2007.

During the post-maturity refinancing negotiations, Point Center Financial learned that Connexian had encumbered all four Coral Blue Project lots with junior liens, in violation of the terms of both Point Center Financial loans. Point Center Financial also was concerned that the construction of the houses on Lots 23 and 28 had suffered from significant cost overruns and had not been timely completed. As of October 2007, the houses on those lots still were not sufficiently completed to be marketed for sale. Ultimately, Point Center Financial declined to refinance the first loan, accelerated the second loan, and foreclosed on all four lots. Neither the Ivars nor Mr. Roche ever received any payments on their investments.

**B.    Mr. Wickam's bankruptcy filing and the plaintiffs' nondischargeability action**

The Ivars and Mr. Roche jointly sued Mr. Wickam first in California state court and later, after Mr. Wickam filed his

11

bankruptcy case, in the bankruptcy court.[3]

The plaintiffs brought to trial claims under § 523(a)(2)(A) and § 523(a)(4). At trial, the bankruptcy court only decided the former claim. The bankruptcy court entered judgment holding Mr. Wickam liable for the Ivars' and Mr. Roche's investments and finding the debt to be nondischargeable under § 523(a)(2)(A). The bankruptcy court subsequently amended its judgment to include a certification pursuant to Civil Rule 54(b).

## C. Appeal of the bankruptcy court's decision

Mr. Wickam appealed the bankruptcy court's judgment. We vacated and remanded, noting that the bankruptcy court's amended statement of decision did not contain sufficient findings. We expressed particular concern that the bankruptcy court's ruling lumped together all three investments made by the Ivars and Mr. Roche, even though the bankruptcy court's one clear finding of misrepresentation arguably only applied to the Ivars' first investment. To the extent the fraud committed against the Ivars was based on a misrepresentation regarding ownership of the four lots, we also expressed a concern that the two notes and one deed of trust the Ivars received **from Connexian** raised serious questions regarding proximate cause and reliance. Finally, we

[3] Mr. Wickam filed his bankruptcy case in Colorado, so the plaintiffs commenced their nondischargeability action against him in the Colorado bankruptcy court. The Colorado bankruptcy court later granted the plaintiffs' motion to transfer venue of the adversary proceeding to United States Bankruptcy Court for the Central District of California, where it was consolidated with four related adversary proceedings in Mr. Werner's pending bankruptcy case. The parties to the other adversary proceedings later settled, leaving only the nondischargeability action against Mr. Wickam for trial.

12

identified as problematic the absence of any specific findings on intent to deceive, knowledge of falsity and justifiable reliance.

**D.    Post-remand proceedings**

On remand, the plaintiffs filed a motion requesting post-remand entry of judgment.  In support of this motion, the plaintiffs relied on all of their trial testimony and exhibits, and presented to the court detailed proposed findings of fact, which separately covered each investment.  Mr. Wickam filed detailed and specific objections to most of the plaintiffs' proposed findings.  In large part, he contended that the record did not support the plaintiffs' proposed findings.

Ultimately, the bankruptcy court adopted virtually all of the plaintiffs' findings as originally proposed, with only limited revisions.  The bankruptcy court then re-entered judgment on the § 523(a)(2)(A) claim in favor of the plaintiffs.

**E.    Motion to reopen evidence or alter or amend the judgment**

Mr. Wickam timely moved to reopen the record and to alter or amend the judgment. He sought to have the court consider "new evidence" regarding Mr. Ivar's criminal fraud conviction arising out of his practice as a chiropractor. He also sought to ensure that the court had given due consideration to the declaration testimony of Mr. Werner, which Mr. Wickam had filed in advance of trial.  The bankruptcy court entered an order denying the motion on August 31, 2017.  Mr. Wickam timely appealed from the nondischargeability judgment and the denial of the post-judgment motion.

**JURISDICTION**

The bankruptcy court had jurisdiction pursuant to 28 U.S.C.

13

§§ 1334 and 157(b)(2)(I), and we have jurisdiction under 28 U.S.C. § 158.

## ISSUES

1. Whether the bankruptcy court erred when it determined that the plaintiffs had established all of the elements for nondischargeable fraud under § 523(a)(2)(A)?

2. Whether the bankruptcy court erred when it denied Mr. Wickam's motion to reopen the record and to alter or amend the judgment?

## STANDARDS OF REVIEW

In appeals from judgments under § 523(a), we review the bankruptcy court's findings under the clearly erroneous standard and its legal conclusions de novo. Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 28 (9th Cir. BAP 2009), aff'd, 407 F. App'x 176 (2010).

The bankruptcy court's credibility findings are entitled to particular deference and only will be disturbed if clearly erroneous. Id. Findings of fact are clearly erroneous only if they are illogical, implausible, or without support in the record. Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010).

We review the bankruptcy court's denial of a motion under Civil Rule 59(e) for an abuse of discretion. Ybarra v. McDaniel, 656 F.3d 984, 998 (9th Cir. 2011). The bankruptcy court abused its discretion if it applied the wrong legal standard or its findings of fact were illogical, implausible, or without support in the record. TrafficSchool.com, Inc. v. Edriver Inc., 653 F.3d 820, 832 (9th Cir. 2011).

14

## DISCUSSION

**A. The bankruptcy court did not err in determining that the debt owed to the Ivars and Mr. Roche was nondischargeable under § 523(a)(2)(A).**

### 1. Elements of nondischargeable fraud

The parties do not dispute that the bankruptcy court identified the correct elements for determining whether Mr. Wickam's liability arose from a fraudulent, nondischargeable act. Those well-established elements are:

> (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.

In re Weinberg, 410 B.R. at 35 (quoting Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman), 234 F.3d 1081, 1085 (9th Cir. 2000)).

The plaintiffs have asserted a mixture of affirmative misrepresentations and omissions. While the elements are largely the same for a claim for fraudulent misrepresentation by omission, in such situations there is no representation upon which one could justifiably rely. Titan Grp., Inc. v. Faggen, 513 F.2d 234, 239 (2d Cir. 1975), cited with approval in Apte v. Romesh Japra, M.D., F.A.C.C., Inc. (In re Apte), 96 F.3d 1319, 1323 (9th Cir. 1996). For this reason, "All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact." In re Apte, 96 F.3d at 1323 (quoting

15

_Affiliated Ute Citizens of Utah v. United States_, 406 U.S. 128, 153-54 (1972)).

We consider these elements and the extent to which they apply to each of the plaintiffs' discrete investments.

## 2. The Ivars' $216,000 investment

### a. The fraudulent misrepresentations and omissions

The Ivars insisted at trial that Mr. Wickam misrepresented the Coral Blue Project's financing and the ownership of the lots to induce them to invest. The bankruptcy court found that Mr. Wickam fraudulently misrepresented these matters by failing to disclose that (1) the project's loan financing was subject to a one-year term; (2) the lender had advised Mr. Wickam and Mr. Werner that it could not fund $2.1 million of the $6.6 million loan; (3) the lender was a hard money lender as opposed to a conventional lender; and (4) Connexian, instead of Coral Blue, LLC, was the entity arranging to purchase the four lots.

The bankruptcy court sometimes referred to Mr. Wickam's conduct as affirmative fraudulent misrepresentation. At other times, however, the court identified the conduct as fraudulent omission. The confusion appears to derive from the Ivars' testimony regarding their understanding of the financing and ownership of the lots. They stated on several occasion that these matters were discussed in the presence of both Mr. Wickam and Mr. Werner but do not attribute any specific representations to Mr. Wickam individually. The parties' post-remand briefs and their appeal briefs treat Mr. Wickam's conduct as a species of fraudulent omission. In light of the parties' agreement regarding the nature of Mr. Wickam's fraud, we treat his conduct

16

as a case of fraudulent omission as well.

Our principal concern regarding the omissions as the basis for fraudulent misrepresentation lies with whether Mr. Wickam had a duty to disclose. As he correctly argues, an omission is not actionable fraud absent a duty to disclose. In re Apte, 96 F.3d at 1323-24. We may look to the Restatement (Second) of Torts ("Restatement") for guidance on what constitutes nondischargeable fraud in general, and whether Mr. Wickam was under a duty to disclose in particular. Id. (citing Field v. Mans, 516 U.S. 59, 70 (1995)). In relevant part, the Restatement specifies that a party to a business transaction must disclose to the other party, before the transaction is consummated:

> (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

> . . .

> (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

Restatement § 551(2)(b), (e).

The bankruptcy court did not make any express finding concerning Mr. Wickam's duty to disclose. Under other circumstances, the absence of specific findings on this issue could be a severe or even fatal impediment to our review in light of the bankruptcy court's duty to provide sufficient findings to support its ruling. See Civil Rule 52(a)(1) (made applicable to adversary proceeding by Rule 7052); see also Simeonoff v. Hiner, 249 F.3d 883, 891 (9th Cir. 2001); First Yorkshire Holdings, Inc.

17

v. Pacifica L 22, LLC (In re First Yorkshire Holdings, Inc.), 470 B.R. 864, 871 (9th Cir. BAP 2012). On the other hand, when the record is fully developed and is sufficient to support the bankruptcy court's ultimate conclusion, we need not remand for further findings. Simeonoff, 249 F.3d at 891. Nor is remand necessary when, as here, the appellate court reasonably can infer from the bankruptcy court's findings other facts that would suffice to support the bankruptcy court's decision. Brock v. Big Bear Mkt. No. 3, 825 F.2d 1381, 1384 (9th Cir. 1987); see also Wells Benz, Inc. v. United States ex rel. Mercury Elec. Co., 333 F.2d 89, 92 (9th Cir. 1964) (stating that appellate court must construe the trial court's findings favorably, such that any doubt as to what the trial court meant is resolved in favor of upholding rather than invalidating the bankruptcy court's judgment).

Here, remand is unnecessary. The elements of fraudulent omission were correctly set forth in the parties' post-remand briefs, and the court had that information available to it when it found that Mr. Wickam's conduct amounted to fraudulent omission. Therefore, we reasonably can infer that the bankruptcy court found that Mr. Wickam owed a duty to disclose fully and completely the ownership and financing of the Coral Blue Project.

The record sufficiently supports this implicit finding. Mr. Wickam and Mr. Werner misled the Ivars during their in-person meetings by stating that conventional project loan financing was "in place." In reality, **Connexian** had procured financing from a hard money lender that was at least $2.1 million short of what it needed and was for a term of only one year. While the evidence

18

presented at trial is ambiguous as to whether Mr. Wickam actually made these representations, he was at least present when they were made. Similarly, Mr. Wickam either made representations, or was present when Mr. Werner made representations, while Mr. Wickam and Mr. Werner were urging the Ivars to invest in Coral Blue, LLC and share in the profits from its development of the four lots it was to purchase. Moreover, Mr. Wickam signed the subscription agreement and operating agreement for the Ivars' investment in Coral Blue, LLC, reinforcing the representation that Coral Blue, LLC would own, develop and sell these properties. These statements misled the Ivars to believe that they were investing in a company that would own and develop the four lots using financing that had been procured from a conventional lender. Both Mr. Wickam and Mr. Werner had a duty to disclose the omitted financing and ownership information in order to avoid misleading the Ivars. See Restatement § 551(2)(b) & cmt. g.

Second, the financing of the project and ownership of the lots were fundamental to the project and the Ivars' investment. A party to a business transaction has a duty to disclose when: (1) the omitted information is "basic" to the transaction; (2) the nondisclosing party knew that the adverse party, in entering into the transaction, was operating under a mistaken belief concerning the omitted information; and (3) it was reasonable under the circumstances for the adverse party to expect disclosure of the omitted information. See Restatement § 551(2)(e).

As the Ivars explained, based on their discussions with

19

Mr. Wickam and Mr. Werner and the documents Mr. Wickam and Mr. Werner signed and gave them, they expected to obtain a return on their investment from **Coral Blue, LLC**'s development and sale of the lots. Yet, Coral Blue, LLC never acquired the lots and had no rights in the lots or to participate in their sales. Moreover, when the Ivars invested, Coral Blue, LLC had no capitalization apart from their $216,000 investment, and even those funds were promptly transferred to Connexian. Even with the Ivars' investment, Connexian had a $2.1 million shortfall in its construction financing and was required to repay the Point Center Financial loan within a year. Each of these facts strikes at the heart of the Ivars' investment. Mr. Wickam was under a duty to accurately and fully disclose the ownership of the lots and the nature of the project financing.

### b. Knowledge of falsity

The bankruptcy court found that, before the Ivars' first investment, Mr. Wickam knew that the first Point Center Financial loan was underfunded, that the term of this loan was for one year and that Point Center Financial was a hard money lender. Mr. Wickam admitted these facts.

As for the omission regarding ownership of the lots, Mr. Wickam claims that the the bankruptcy court's finding regarding his knowledge of falsity was clearly erroneous. According to Mr. Wickam, there was a last-minute decision dictated by Point Center Financial, or by the escrow company handling the closing, to switch from Coral Blue, LLC as the purchaser/owner to Connexian.

Mr. Wickam relies on his declaration testimony to support

20

this position. But the bankruptcy court found Mr. Wickam not credible generally, and nothing he has said on appeal persuades us that the bankruptcy court's credibility finding was clearly erroneous. More to the point, there were numerous admitted facts and exhibits demonstrating that, from the inception of the project, Connexian was slated to be the owner of the four lots. It was Connexian, not Coral Blue, LLC, that contracted to purchase the lots. Connexian negotiated the extensions of time to purchase the lots and made the deposits necessary to obtain those extensions. It was also Connexian that applied for the construction loan from Point Center Financial to finance the purchase of the lots. The record is devoid of any references that identified Coral Blue, LLC as a party to these transactions (apart from Mr. Wickam's and Mr. Werner's representations to the Ivars and Mr. Roche).

The record amply demonstrates that Mr. Wickam knew the true nature of the project financing, and that Connexian rather than Coral Blue, LLC owned the four lots, at the time the Ivars made their investment in Coral Blue, LLC. In short, the bankruptcy court's findings that Mr. Wickam knew that his nondisclosure of the project's financing and ownership was false and deceptive were not clearly erroneous.

### c. Intent to deceive

The bankruptcy court found that Mr. Wickam failed to disclose the above-referenced information regarding the project loan financing and Connexian's bid to obtain ownership of the lots for the sole purpose of inducing the Ivars to make their $216,000 investment. This is a finding of intent to deceive.

21

Seldom do fraud defendants provide direct evidence of their intent to deceive. See Tustin Thrift & Loan Ass'n v. Maldonado (In re Maldonado), 228 B.R. 735, 738 (9th Cir. BAP 1999). Instead, bankruptcy courts typically must infer intent (or the absence of intent) from circumstantial evidence. Id.

Nothing Mr. Wickam has argued on appeal persuades us that the bankruptcy court's intent finding was clearly erroneous. Essentially, he argues that he was just in charge of the construction. He maintains that he relied on Mr. Werner to properly and truthfully present the investment opportunity to the Ivars, so he could not have formed an intent to deceive them. But the bankruptcy court did not believe Mr. Wickam's version of events.

The record again supports the bankruptcy court's inference that Mr. Wickam played an active and purposeful role in the solicitation of the Ivars' investment in Coral Blue, LLC. The Ivars testified that Mr. Wickam was a party to their discussions concerning Coral Blue, LLC's purchase and development of the four lots and the financing of that project. Mr. Wickam also was involved in Connexian's purchase of the lots from the beginning, including its funding. Given Mr. Wickam's active participation in the financing and purchase of the lots, his solicitation of the Ivars' investment is difficult to explain as anything other than fraudulent. The record supports the bankruptcy court's finding that Mr. Wickam omitted information with the intent to deceive the Ivars for the purpose of obtaining their investment.

### d. Materiality

As indicated above, in cases of fraudulent omission,

22

bankruptcy courts are required to make a finding of materiality in lieu of finding justifiable reliance. In re Apte, 96 F.3d at 1323. An omission is material if a reasonable investor would have wanted to know the information before investing. Id. Thus, the materiality issue focuses on what a reasonable investor would want to know. See id. In essence, the plaintiffs are presumed to have relied on the omission if it was material. See id.

Here, the bankruptcy court found that the information regarding the project loan financing and Connexian's bid to obtain ownership of the lots was material and that any reasonable investor would have wanted to know this information before investing. More specifically, the bankruptcy court found that a reasonable investor would have wanted to know that the first Point Center Financial loan was for a one-year term, that the loan was underfunded by $2.1 million, and that Point Center Financial was a hard money lender. The bankruptcy court further found that a reasonable investor would have wanted to know that Connexian, instead of Coral Blue, LLC, was the entity with the contractual right to purchase the four lots.

As previously discussed, the financing of the Coral Blue Project and ownership of the lots were fundamental to any reasonable investor's decision to invest in Coral Blue, LLC. The findings that the omissions were material were not illogical, implausible or unsupported by the record. Accordingly, they were not clearly erroneous.

### e. Causation and damages

The bankruptcy court found that Mr. Wickam's omissions caused the Ivars to lose their $216,000 investment. He has not

23

challenged on appeal the amount of damages the plaintiffs suffered, but he disputes that his conduct caused the plaintiffs to suffer those damages.

Again, we turn to the Restatement for guidance. Under the Restatement, the causation inquiry is twofold. A finding of causation requires the bankruptcy court to determine the existence of: (1) causation in fact, and (2) legal causation. A misrepresentation or omission is a cause in fact if it was "a substantial factor" in determining the course of conduct leading to the loss. Restatement §§ 546, 548A; see also Sharfarz v. Goguen (In re Goguen), 691 F.3d 62, 70 (1st Cir. 2012). The misrepresentation or omission is the legal cause of damages if the creditor's loss reasonably could be expected to result from the reliance. Restatement § 548A.

In most cases of fraudulent inducement, like here, the loss necessarily flows from the acts induced. See Restatement § 549(1) (stating that fraud damages include: (a) the difference between the value of what plaintiff actually received and its purchase price; and (b) all other pecuniary loss suffered as a result of the plaintiff's reliance upon the misrepresentation). This has been the correct measure for determining the loss flowing from fraudulently induced conduct for well over a century. See Sigafus v. Porter, 179 U.S. 116, 122-23 (1900).

As to all of the omissions, the bankruptcy court found that, if the Ivars had known the true facts, they would not have made their $216,000 investment. This finding is not challenged on appeal. "If the misrepresentation has in fact induced the recipient to enter into the transaction, there is causation in

24

fact of the loss suffered in the transaction." Gem Ravioli, Inc. v. Creta (In re Creta), 271 B.R. 214, 219 (1st Cir. BAP 2002) (quoting Restatement § 546). The Ivars invested their $216,000 into Coral Blue, LLC because Mr. Wickam and Mr. Werner led them to believe that Coral Blue, LLC would own four lots and had the financing to develop them. These misrepresentations were the cause in fact of their investment, and, as a result, their loss.

We acknowledge that this Panel expressed concern in its prior decision regarding the existence of the unsecured promissory note made by Connexian in favor of the Ivars covering the same $216,000 investment. The Ivars explained, however, that they understood that they were purchasing equity in Coral Blue, LLC, and would be paid through the sale of the developed lots. The Ivars testified that they paid little or no attention to the promissory note from Connexian. The Ivars invested in Coral Blue, LLC. They expected to recover their investment and share in profits from Coral Blue, LLC after it developed the lots it was supposed to purchase using the conventional financing Mr. Werner and Mr. Wickam said it had. In truth, Coral Blue, LLC had no assets, no conventional financing, and no ability to return the Ivars' investment, much less make any profit. The Ivars' only prospect of payment was tied to an unsecured promise to repay their investment with interest from an otherwise unknown corporation. The record supports the bankruptcy court's finding that these misrepresentations about Coral Blue, LLC were a substantial factor in their loss, satisfying the causation in fact requirement.

Mr. Wickam's challenge as to causation goes more directly to

25

legal causation. He asserts that the Ivars' loss actually was caused by Point Center Financial's decision to foreclose and by the 2008 crash of the residential real estate market. This argument, however, does not negate the foreseeability of the Ivars' loss, given Mr. Wickam's misrepresentations that Coral Blue, LLC had conventional financing to purchase and develop real property that it never owned. Rather, Mr. Wickam effectively contends that the market crash and the foreclosure were intervening causes of the loss that absolve him of liability. But the Restatement reflects a much more limited role for intervening causes in relationship to legal causation:

> In determining what is foreseeable as a result of the misrepresentation, the possibility of intervening events is not to be excluded altogether. Thus, when the financial condition of a corporation is misrepresented and it is subsequently driven into insolvency by reason of the depressed condition of an entire industry, which has no connection with the facts misrepresented, it may still be found that the misrepresentation was a legal cause of the recipient's loss, since it may appear that if the company had been in sound condition it would have survived the depression, and hence that a loss of this kind might reasonably have been expected to follow.

Restatement § 548A, cmt. b.

Here, Mr. Wickam's position ignores the reality of the transaction and the facts presented at trial. Point Financial Center's financing came due in one year, a fact that Mr. Wickam and Mr. Werner knowingly concealed from the Ivars. Connexian also failed to complete the construction on the first two lots within that year, causing the default that led Point Financial Center to foreclose on Connexian's lots. The loss from a speculative, underfunded, and misrepresented construction project was wholly foreseeable, if not inevitable.

26

The bankruptcy court's findings adequately addressed causation and damages. They are supported by the record, and they are not clearly erroneous.

### 3. Mr. Roche's $200,000 investment

Mr. Roche testified to his understanding of hard money lending as lending to a borrower who is not creditworthy and who is a bad risk to the lender. He maintained that, had he known that the Coral Blue Project was relying on a hard money lender for its loan financing, he would not have invested in the project.

Mr. Roche additionally insisted that, had he known about the one-year term for the Point Center Financial loan, and the fact that more than $2 million of the Point Center Financial loan was unfunded, he would not have invested his $200,000 in the Coral Blue Project.

As Mr. Roche explains, he only learned after he made his $200,000 investment that the four lots were purchased in Connexian's name rather than in the name of Coral Blue, LLC. He maintains that, had he known Coral Blue, LLC was not going to hold title to the properties, he would not have invested his $200,000.[4]

The bankruptcy court's findings regarding Mr. Roche's $200,000 investment were very similar to its findings regarding the Ivars' $216,000 investment. The bankruptcy court found the

_____

[4] According to Mr. Roche, he had no involvement with or knowledge of Connexian at the time of his investment. This was not strictly true, as both of his investment checks were made payable to Connexian. The record is not clear why Mr. Roche paid money to Connexian for an investment in Coral Blue, LLC.

27

same four omissions regarding ownership of the lots and the project's loan financing.[5]

The evidence supporting the bankruptcy court's fraud findings with respect to Mr. Roche's $200,000 investment does not materially differ from the evidence adduced concerning the Ivars' $216,000 investment. We similarly uphold the bankruptcy court's fraud findings in favor of Mr. Roche on his $200,000 investment.

**4.   The Ivars' $600,000 investment**

The bankruptcy court grouped the Ivars' second and third payments into a unitary second investment. The court's findings as to the combined $600,000 investment focused on two different misrepresentations: a misrepresentation that Mr. Wickam and Mr. Werner needed the additional funding for "bricks and sticks" and a misrepresentation regarding the organizational status of Coral Blue II, LLC.

The bankruptcy court also found that, but for the misrepresentations that induced the Ivars to make their first $216,000 investment, they would not have made the second $600,000

[5] There was one additional fraudulent omission the bankruptcy found with respect to Mr. Roche's investment: that Mr. Wickam and Mr. Werner failed to disclose to Mr. Roche the existence of other investors in Coral Blue, LLC. Mr. Roche complained that the copy of the Coral Blue, LLC operating agreement he was given only listed himself, Mr. Wickam and Mr. Werner as members. It did not list the Ivars or several other Coral Blue, LLC investors (presumably solicited by Mr. Wickam and Mr. Werner). Nonetheless, Mr. Roche admitted that he did not receive his copy of the Coral Blue, LLC operating agreement or his subscription agreement until after he invested. Consequently, the omission of some of the Coral Blue, LLC investors from the membership list in his copy of the operating agreement does not support Mr. Roche's claim that he was defrauded into investing in the Coral Blue Project.

28

investment. The bankruptcy court reasoned that the loss of the second investment flowed from the initial misrepresentations.

We conclude that the bankruptcy court's findings concerning the "bricks and sticks" misrepresentation were not clearly erroneous and were sufficient to support its judgment as to the second investment.

The bankruptcy court found that Mr. Wickam told the Ivars that their second investment funds would be used for "bricks and sticks," meaning direct development expenses for Lots 26 and 27. This finding is supported by the Ivars' testimony and is not clearly erroneous.

The bankruptcy court next found that this representation was false because Mr. Wickam and Mr. Werner used a substantial portion of those funds for other purposes, including payments to themselves. Mr. Wickam argues that this finding was wrong because Mr. Werner testified that all of the Ivars' $600,000 actually was used for the development of the two lots. But this argument ignores the parties' stipulation of admitted facts. Mr. Wickam agreed that there was little or no money in Connexian's account when the Ivars' funds were deposited and that immediately after the deposit, Connexian made substantial payments not related to the development of the lots. These included payments to Mr. Wickam and Mr. Werner. These admitted facts support the bankruptcy court's finding that Mr. Wickam misrepresented the need for and purpose of the additional $600,000 investment from the Ivars.

Mr. Wickam challenges the bankruptcy court's finding that he knew that the "bricks and sticks" misrepresentation was false and

29

that he made the misrepresentation with the intent to deceive the Ivars. He argues that no evidence supports these findings. But, as we have observed above, direct evidence of fraudulent knowledge and intent to deceive is rarely available because people rarely confess to fraud. Therefore, courts may and usually must rely on inferences from other evidence. In this case, the bankruptcy court did not commit clear error when it inferred Mr. Wickam's mental state from the admitted facts that he was in charge of construction budgets and Mr. Wickam and Mr. Werner immediately used most of the Ivars' second investment for other purposes, including a payment to Mr. Wickam himself.

Mr. Wickam also challenges the bankruptcy court's finding that the Ivars justifiably relied on the "bricks and sticks" misrepresentation when they made their second investment.

In Field v. Mans, the United States Supreme Court held that fraud under § 523(a)(2)(A) requires only a showing of justifiable reliance rather than the higher standard for reasonable reliance. The Court clarified that a creditor's reliance was to be evaluated using a subjective standard: "a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" 516 U.S. at 71 (citing Restatement § 540). In contrast to reasonable reliance, the Supreme Court explained that "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." Id.; see also Citibank (S. Dakota), N.A. v. Eashai (In re Eashai), 87 F.3d 1082, 1090 (9th

30

Cir. 1996).

While justifiable reliance is broader than reasonable reliance, it is not without limits. Again citing to the Restatement, the Court in Field acknowledged that one is still "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." Field, 516 U.S. at 71 (quoting Restatement § 541, cmt. a). The Supreme Court further elaborated:

> justifiable reliance is the standard applicable to a victim's conduct in cases of alleged misrepresentation and that "**[i]t is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived,** that he is required to make an investigation of his own."

Id. at 71-72 (citing W. Prosser, Law of Torts § 108, p. 718 (4th ed. 1971)) (emphasis added).

Accordingly, while a plaintiff's negligence, by itself, is insufficient to defeat a finding of justifiable reliance, the plaintiff "cannot close his eyes and blindly rely" on whatever the debtor says. In re Apte, 96 F.3d at 1322-23 (citing In re Eashai, 87 F.3d at 1090-91). In other words, the justifiable reliance standard does not permit the plaintiff to ignore red flags that obviously call into question the truth of the debtor's representations regarding the transaction. See, e.g., Yim v. Chaffee (In re Chaffee), BAP No. CC-16-1241-TaFC, 2017 WL 1046057, at *6-7 (9th Cir. BAP Mar. 17, 2017), aff'd, 713 F. App'x 641 (9th Cir. Feb. 23, 2018); Edgewater Place, Inc. v. Real

31

Estate Collateral Mgmt. Co. (In re Edgewater Place, Inc.), No. ED CV 98-281 RT, 1999 WL 35136576, at *7 (C.D. Cal. May 18, 1999); Mandalay Resort Grp. v. Miller (In re Miller), 310 B.R. 185, 198-99 (Bankr. C.D. Cal. 2004).

In this case, there was no reason for the Ivars to doubt Mr. Wickam's representation that he and Mr. Werner would use the Ivars' second investment for "bricks and sticks," meaning direct development costs for the second pair of Coral Blue Project lots.[6]

Finally, Mr. Wickam contends that the misrepresentations were not the proximate cause of the Ivars' loss of their second investment. He relies on the same arguments that he advances in connection with the Ivars' first investment. Those arguments have no more merit when applied to the second investment than they have with respect to the first.

**B.    The bankruptcy court did not err in denying Mr. Wickam's motion to reopen the record and to alter or amend the judgment.**

By way of his post-judgment motion, Mr. Wickam sought two things: (1) to ensure that the bankruptcy court had duly considered Mr. Werner's declaration testimony; and (2) to have

_____

[6] The dissent concludes that there were too many "red flags" of deception to sustain a finding of justifiable reliance. We appreciate the dissent's careful and thorough dissection of the evidence. We acknowledge that the presentation of the Ivars' case leaves much to be desired and that the question is a close one. We note, however, that the Ivars faced a low bar at trial – they only had to show that a "casual glance" would not have revealed the fraud – and that Mr. Wickam faces a high bar on appeal: the clearly erroneous standard of review. We think that Mr. Wickam has not carried his heavy burden of showing that the bankruptcy court committed clear error when it decided that the Ivars had carried their light burden.

32

the court reopen the record to consider Mr. Ivar's conviction arising from referral kickback activities he engaged in as a chiropractor. On appeal, Mr. Wickam only challenges the bankruptcy court's denial of relief with respect to the evidence of Mr. Ivar's conviction. In addition, Mr. Wickam concedes that Mr. Ivar's conviction is not directly relevant to his investor activities that are the subject of the underlying adversary proceeding. Instead, Mr. Wickam claims that the conviction undermines Mr. Ivar's credibility as a witness. He urges that, based on the conviction, the bankruptcy court should have, at a minimum, reassessed the credibility of Mr. Ivar's story regarding his investments or, alternately, stricken his testimony in its entirety.

To support his motion, Mr. Wickam relied on Civil Rule 59(e), which is made applicable in adversary proceedings by Rule 9023. Relief under Civil Rule 59(e) requires the movant to demonstrate either newly discovered evidence, clear error, manifest injustice, or an intervening change in the law. Zimmerman v. City of Oakland, 255 F.3d 734, 740 (9th Cir. 2001). On appeal, Mr. Wickam solely relies on the newly discovered evidence prong of Civil Rule 59(e). To support his entitlement to relief under this prong, Mr. Wickam needed to establish:

> (1) the evidence was discovered after trial, (2) the exercise of due diligence would not have resulted in the evidence being discovered at an earlier stage and (3) the newly discovered evidence is of such magnitude that production of it earlier would likely have changed the outcome of the case.

Defenders of Wildlife v. Bernal, 204 F.3d 920, 929 (9th Cir. 2000).

33

The transcript from the hearing on the motion reflects that the bankruptcy court considered these factors and found that Mr. Wickam had not met his burden to establish all of them. Most importantly, the bankruptcy court was not persuaded regarding the third element: that the newly discovered evidence was of such a magnitude that production of it earlier likely would have changed the outcome of the case. Id.

On this record, we cannot say that the bankruptcy court's finding on this third element was clearly erroneous. This is especially true here, given that Mr. Wickam's newly discovered evidence was not directly connected to the conduct and events that were at issue in the underlying adversary proceeding.

Accordingly, the bankruptcy court did not commit reversible error when it denied Mr. Wickam's postjudgment motion.

## CONCLUSION

For the reasons set forth above, we AFFIRM the bankruptcy court's nondischargeability judgment and its denial of Mr. Wickam's postjudgment motion under Civil Rule 59(e).

Concurrence in Part and Dissent in Part begins on next page.

34

SPRAKER, Bankruptcy Judge, concurring in part and dissenting in part.

I concur with the reasoning and conclusions reached in subsections A.2. and A.3. of the Discussion section of the majority decision. Those sections affirm the bankruptcy court's ruling that Mr. Wickam fraudulently induced the Ivars' first investment, and Mr. Roche's sole investment, in Coral Blue, LLC. In subsection A.4., the majority similarly affirms the bankruptcy court's ruling that Mr. Wickam fraudulently induced the Ivars' second investment. I disagree. In my view, the bankruptcy court's justifiable reliance finding concerning the Ivars' second investment irreconcilably conflicts with its findings regarding the Ivars' first investment. Based on this, I believe that the bankruptcy court's conclusion that the Ivars justifiably relied on the misrepresentation relating to the second investment is illogical, and, therefore, clearly erroneous. I would reverse the judgment as to the Ivars' second investment, and I dissent to that limited extent.

**A.     The Clearly Erroneous Standard.**

This appeal demonstrates the inherent tension in the clearly erroneous standard. As the Supreme Court aptly has explained,

> If the [factfinder's] account of the evidence is plausible in light of the record viewed in its entirety, [the appellate court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

Anderson v. City of Bessemer City, 470 U.S. 564, 573–74 (1985). Anderson held that appellate courts overstep the bounds of their

1

duty if they merely substitute their judgment of the facts in place of the factfinder's. As Anderson put it, the appellate court must not decide factual issues de novo. Id. at 573.

On the other hand, the clearly erroneous standard is not a "blank check" that permits a trial court, sitting without a jury, to make any findings it deems necessary to reach its desired result. At bottom, the standard sets forth a rule of reason. The factfinder's view of the evidence is not "permissible" – and is clearly erroneous – when it is "'illogical or implausible' or lacks 'support in [reasonable] inferences that may be drawn from facts in the record.'" United States v. Hinkson, 585 F.3d 1247, 1261 (9th Cir. 2009) (en banc) (quoting Anderson, 470 U.S. at 577). When factual issues are controlling, the deferential nature of the clearly erroneous standard does not permit appellate courts to shy away from "meticulous" and "comprehensive" review of the record to ensure that the findings are logical, plausible and supported by the record. See Anderson, 470 U.S. at 581 (Powell, J., concurring). With the standard in mind, I turn my attention to my concerns with the bankruptcy court's determination of fraud as to the Ivars' second investment.[1]

---

[1] I focus my discussion upon the element of justifiable reliance. But the court's findings as to knowledge of falsity and intent also merit a brief mention. The court based its findings on these elements upon statements in the Ivars' declarations that "Mr. Werner and Mr. Wickam indicated it was a perfect time to get an early start on lots 26 and 27 and needed additional funds for 'bricks and sticks' on the project which I understood to mean actual construction costs." Alan Ivar Decl. (Sept. 20, 2013) at ¶ 67; Deborah Ivar Decl. (Sept. 20, 2013) at

(continued...)

2

**B.    The Justifiable Reliance Finding.**

Mr. Wickam argues that the court erred in finding that the Ivars justifiably relied on the "bricks and sticks" misrepresentation in making their second investment of $600,000. While there was nothing suspicious concerning the statement that the Ivars' funds would be used for "bricks and sticks," the Ivars were aware of numerous other red flags concerning their second investment. In my opinion, the Ivars failed to prove that they justifiably relied on the bricks and sticks misrepresentation when they ignored those red flags.

To briefly recap, the Ivars' second investment consisted of a $200,000 installment paid in December 2006, and a $400,000 installment paid in April 2007. As Mr. Wickam points out, the Ivars contend that they were investing this time in Coral Blue **II**, LLC to develop lots 26 and 27, but they paid their investment funds to Connexian rather than Coral Blue II, LLC. In exchange for their $200,000 installment, the Ivars received a 30-day

[1](...continued)
¶ 67. While these statements establish that Mr. Wickam made, or was aware of, these representations they fall short of establishing that Mr. Wickam knew the falsity of the statement or intended to deceive the Ivars at that time. There is simply nothing in the statements cited by the bankruptcy court that goes to knowledge of falsity or intent. However, the court made two other findings that arguably support its knowledge and intent determinations. First it found that, at the time Connexian received the Ivars' two payments comprising the second investment, the business accounts "were at or near a zero balance." And second, it found that Mr. Wickam received payments shortly after each investment. Mindful of the deference given to the bankruptcy court's factual findings, I cannot say that its findings of knowledge and intent are clearly erroneous based on the totality of the evidence.

3

promissory note from Connexian bearing 7% interest. They also received a deed of trust from Connexian against lots 26 and 27 to secure repayment of the promissory note. The record reflects that, at the time the Ivars made their $200,000 installment, they did not receive a single document from, or about, Coral Blue II, LLC.

Four months later, the Ivars paid an additional $400,000 to Connexian for an additional investment in Coral Blue II, LLC. This time, the Ivars did receive and sign an operating agreement for Coral Blue II, LLC at the time they made this second payment. Like the first installment payment, this second installment was paid to Connexian rather than Coral Blue II, LLC. The Ivars did not receive a promissory note in exchange for their $400,000 payment, though by this time Connexian's 30-day note for the prior $200,000 "loan" already was in default. They testified that they understood they would receive 25% of the net proceeds from the sales of lots 26 and 27. The Ivars failed to address Mr. Wickam's justifiable reliance argument in their appeal brief.

The majority decision thoroughly sets forth the metes and bounds of the justifiable reliance standard and there is no need to reiterate those points here. However, it bears repeating that the subjective nature of the standard cuts both ways. See Field v. Mans, 516 U.S. 59, 76 (1995). Because justifiable reliance focuses on the circumstances of the individual case and particularly on the fraud plaintiffs' state of mind, the plaintiffs must be charged with all knowledge (and beliefs) they admit to having. See generally Id. at 71-72 (holding that justifiable reliance focuses on the knowledge, intelligence, and

4

other "qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than [on] the application of a community standard of conduct to all cases.").

Although creditors are not generally required to investigate their debtors, this does not mean that they are never required to investigate. Yim v. Chaffee (In re Chaffee), BAP No. CC-16-1241-TaFC, 2017 WL 1046057, at *6-7 (9th Cir. BAP 2017), aff'd, 713 F. App'x 641 (9th Cir. Feb. 23, 2018), at *7 (quoting Eugene Parks Law Corp. Defined Benefit Plan v. Kirsh (In re Kirsh), 973 F.2d 1454, 1460 (9th Cir. 1992)). Rather, justifiable reliance "turns on a person's knowledge under the particular circumstances." Citibank (S. Dakota), N.A. v. Eashai (In re Eashai), 87 F.3d 1082, 1090 (9th Cir. 1996). The court "must look to all of the circumstances surrounding the particular transaction, **and must particularly consider the subjective effect of those circumstances upon the creditor**." In re Chaffee, 2017 WL 1046057 at *7 (emphasis added). When fraud plaintiffs receive information that, given the circumstances and their level of knowledge and intelligence, should warn them that the defendant might be deceiving them, they cannot blindly rely on the defendant's representations. Field, 516 U.S. at 71-72(citing W. Prosser, Law of Torts § 108, p. 718 (4th ed. 1971)); see, e.g., In re Eashai, 87 F.3d at 1091 ("We will not allow a creditor, who has been put on notice of the debtor's intent not to repay, to extend credit and then later claim nondischargeability on the basis of fraud"); McClammer v. Holmes (In re Holmes), 570 B.R. 610, 621 (Bankr. W.D. Mo. 2017) (holding that at some point

5

multiple misrepresentations precluded a finding of justifiable reliance); Cooper v. Lemke (In re Lemke), 423 B.R. 917, 924 (10th Cir. BAP 2010) (no justifiable reliance where plaintiff continued to lend money after red flags arose). "Reliance falls below the justifiable standard when 'red flags' are ignored." Hopper v. Lewis (In re Lewis), 551 B.R. 41, 49 (Bankr. E.D. Cal. 2016).

The Ivars' $600,000 investment was not their first transaction with Mr. Wickam and Mr. Werner, and they are charged with that history. Importantly, they carry with them the representations on which they relied to enter into their first investment on this project. The Ivars testified that when they made their first investment they believed Coral Blue, LLC owned the four Coral Blue lots. They also understood that Coral Blue, LLC would develop the four lots, and they would be paid from the sale of those lots. Based on this understanding, the Ivars further testified that Coral Blue, LLC's role in the transaction was critical to them. As the Ivars put it, had they known that Coral Blue, LLC was not going to own the four lots, they would not have made their first investment. The bankruptcy court credited this testimony in its findings, and the majority decision relies upon these findings in affirming the Ivars' claims for fraudulent misrepresentation as to the first investment. I concur in this conclusion.

And yet, only a few months later, in the midst of making their decision to invest an additional $200,000 in December 2006, the Ivars were asked to invest in a new entity but on the same project in which they had previously invested. As they explained it, the Ivars were to be paid from two of the same lots that

6

Coral Blue, LLC previously committed to sell to fund payment on the Ivars' first investment. Moreover, in making their $200,000 payment to Connexian, the Ivars were confronted with proof, provided to them by Mr. Wickam and Mr. Werner, that Coral Blue, LLC did not own two of the four lots. Connexian did. And the Ivars paid the $200,000 to Connexian. Instead of receiving any interest in Coral Blue II, LLC at the time they first paid Connexian, the Ivars received a 30-day promissory note from Connexian secured by two of the lots Coral Blue, LLC supposedly owned. At that time, they were instructed not to record that deed of trust. Even overlooking the instruction not to record the deed of trust, Connexian's deed of trust goes to the ownership of the lots. This directly conflicts with the Ivars' fundamental understanding of their first investment made only a couple of months earlier: that Coral Blue, LLC owned and was developing all four Coral Blue lots, including lots 26 and 27.

The Ivars are charged with the knowledge gained in their first transaction, and the two transactions are inherently inconsistent. The Ivars testified that ownership and development of the Coral Blue lots was critically important to them, and they would not have made their first investment had they known that Coral Blue, LLC did not own all four lots. Given that, it was neither logical, nor plausible, that the Ivars justifiably relied on any further solicitation statements when they knew **three** different entities controlled by Mr. Werner and Mr. Wickam had made conflicting claims of ownership and the right to develop the Coral Blue lots. The Ivars were not entitled to turn a blind eye to the competing claims of ownership, multiple entities,

7

secretive collateral, and the breach of the $200,000 promissory note in making their second investment. There were simply too many red flags for the Ivars to ignore before making their second investment.

It was the Ivars' burden of proof to establish all of the elements necessary to establish nondischargeability under § 523(a)(2)(A), including justifiable reliance. See Field, 516 U.S. at 66; Grogan v. Garner, 498 U.S. 279, 284-85 (1991); see also Sachan v. Huh (In re Huh), 506 B.R. 257, 262 (9th Cir. BAP 2014) (en banc). Yet the Ivars did not even attempt to address the red flags that existed at the time they made their second investment. There is nothing in the record remotely explaining what they were thinking about the introduction of Coral Blue II, LLC and Connexian into the project.[2] The record is totally devoid of any explanation as to how they thought they would be paid by the two Coral Blue entities from the sale of the same two lots that Connexian owned.

In sum, I conclude that the bankruptcy court committed clear error when it found that the Ivars justifiably relied on the

[2] There was some discussion at trial regarding the Ivars' separate investment in another Wickam and Werner project in Colorado in which Connexian was involved. That matter, and any relationship with Connexian's ownership of the Coral Blue lots, was not developed. More importantly, it does not alter the Ivars' testimony that they would not have made their first investment in Coral Blue, LLC if they had known that the four lots would not be owned by the entity in which they were investing. Yet they invested in Coral Blue II, LLC with knowledge that Coral Blue, LLC should have owned the lots and that Connexian claimed to own the lots.

8

"bricks and sticks" misrepresentation.[3]  The finding is illogical, implausible, and not supported by the record.  Because the Ivars failed to prove an element of their § 523(a)(2)(A) claim as to their second investment, I would reverse the judgment excepting that debt from discharge.

[3] The bankruptcy court alternately found that Mr. Wickam and Mr. Werner fraudulently induced the Ivars' second investment by misrepresenting the organizational status of Coral Blue II, LLC. According to the Ivars, they were falsely led to believe that Coral Blue II, LLC filed its Articles of Organization with the California Secretary of State in March 2007, when in fact the Articles of Organization were not filed until several months later.  Neither the parties nor the majority decision focus on this alternate fraud ground.  This fraud finding is problematic for several reasons.  For instance, the representation occurred after the Ivars paid the first $200,000 of their second investment.  Second, in light of the transactional irregularities noted above, the Ivars could not have justifiably relied on the organizational status misrepresentation any more than they relied on the "bricks and sticks" misrepresentation.  Most importantly, there is a lack of proximate cause in relation to this misrepresentation.  See Ghomeshi v. Sabban (In re Sabban), 384 B.R. 1, 6-7 (9th Cir. BAP 2008) (noting similar causal disconnect between statutory disgorgement debt and plaintiff's alleged fraud loss).

The bankruptcy court further held that the fraud pertaining to the Ivars' first investment supported the nondischargeability of the debt arising from their second investment.  The Ivars press this point on appeal: "Had Wickam not engaged in fraud in the first place, the Ivars would not have invested their initial $216,000 and thereafter not been in a position to have invested an additional $600,000."  The majority decision does not address this holding because it relies on the fraud holding pertaining to the "bricks and sticks" representation.  Suffice it to say that there is no logical way Mr. Wickam's misrepresentations that induced the Ivars' first investment also could have induced the Ivars' second investment **in a different entity**. See generally Cohen v. De La Cruz, 523 U.S. 213, 220-23 (1998) (indicating that debt must flow from the fraud to be nondischargeable); In re Sabban, 384 B.R. at 6-7 (same).

9